**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roger TURNER, Defendant–Appellant.**

**No. 95–2831.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1996.

Decided Aug. 13, 1996.

John W. Vaudreuil, Timothy O'Shea (argued), Office of U.S. Atty., Madison, WI, for U.S.

Stephen J. Eisenberg, Madison, WI (argued), for Roger Turner.

Before EASTERBROOK, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Presented with a two-count indictment, a jury convicted Roger Turner of conspiracy to possess methamphetamine with the intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846, and of possessing methamphetamine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). He now appeals his conviction and sentence. Mr. Turner challenges the sufficiency of the evidence supporting his conspiracy conviction. He then challenges several trial decisions of the district court: (1) the district court's denial of his motion to sever Counts I and II of the indictment; and (2) the district court's refusal to give his

proffered buyer-seller instruction on the conspiracy count. Finally, he challenges several aspects of the sentencing proceeding: (1) the constitutionality of the sentencing scheme for methamphetamine; (2) the district court's determination that "all of the controlled substances in this case" were intended for distribution and properly considered relevant conduct; and (3) the application of a two-level sentencing enhancement for possessing a firearm in connection with the substantive possession offense. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### 1.

Count I of the indictment charges Mr. Turner with participating in a conspiracy that is alleged to have lasted from October 1991 to January 1992. After living in the State of Washington during the 1980s, Mr. Turner returned to Beloit, Wisconsin in May 1991. Taking up residence there, he renewed his twenty-year-old friendship with Dennis and Nancy Brice. He introduced the Brices to methamphetamine, and the three of them began smoking the drug together on an almost daily basis. Dennis Brice later testified that, toward the end of the period leading up to his arrest, he (Brice) was smoking methamphetamine three or four times per day.

In December 1991, Dennis and Nancy Brice began accepting packages for Mr. Turner at their residence. Twice during that month, United Parcel Service delivered packages to the Brice residence. Each package had a return address in the State of Washington. Mr. Turner was present at the Brice residence for the arrival of both deliveries. Mr. Brice signed for the packages on both occasions. Each package contained, among other items, a false-bottom can that concealed syringes, pills and methamphetamine. On each occasion, Mr. Turner shared a small quantity of the methamphetamine with the Brices, and then departed with the contents of the packages.

Acting on a tip from Washington law enforcement officials that a third package was en route to the Brice residence, Detective Orville Kreitzmann effected a controlled delivery of the package. After Dennis Brice signed for the package, the police arrested the Brices and Mr. Turner, who again was present for the delivery. A search of the package revealed that it contained methamphetamine, marijuana and $10,000 in cash. Mr. Brice consented to a search of his residence, and the police recovered a glass pipe, a small quantity of marijuana, several firearms and six packages containing a total of 19.16 grams of methamphetamine.

### 2.

Count II of the indictment charges Mr. Turner with the substantive offense of possessing methamphetamine with the intent to distribute. The conduct giving rise to this charge is alleged to have occurred on April 13, 1993—more than a year after the Count I conspiracy is alleged to have ended.

In early 1993, Sheriff's Deputy Darla Hoerler was working undercover in Rock County, Wisconsin. An informant introduced her to a group of individuals, including Jamie Shaw and Donald Stenberg, who supposedly could obtain methamphetamine in Beloit. On April 11, 1993, Deputy Hoerler contacted Shaw and Stenberg. She indicated that she had a quantity of Percodan, a prescription pain medication, and asked them to set up an exchange of the prescription drug for methamphetamine.[1] Shaw and Stenberg agreed. The next day, Deputy Hoerler drove them to Mr. Turner's neighborhood, but the mission had to be aborted because no one was home at 1312 Elm Street—Mr. Turner's residence. On their second attempt, the threesome returned to

---

1. On a previous occasion, Deputy Hoerler had obtained .09 grams of methamphetamine from Jamie Shaw's sister, Sheila Shaw. On that occasion, Sheila Shaw, after making a phone call from a pay phone, directed Deputy Hoerler to drive the car to 1312 Elm Street, where Mr. Turner lived, and to park a short distance away. Ms. Shaw exited the vehicle with a prescription bottle bearing the label "Erythromycin." Deputy Hoerler observed Ms. Shaw walk to the side door of the house at 1312 Elm Street and return with a small package of methamphetamine.

that address and parked nearby. Shaw and Stenberg exited the vehicle with the Percodan. Deputy Hoerler observed the pair proceed through the backyards toward Mr. Turner's house, and another officer was able to observe them walking to the north front door. Shaw and Stenberg returned to the car minutes later without the Percodan and informed Deputy Hoerler that they would have to come back in 20 minutes for the methamphetamine. The police arrested Shaw and Stenberg shortly thereafter and, in the search incident to arrest, found on their persons a glass pipe, a Ziploc baggie containing methamphetamine and 13 to 14 Percodan tablets.

The police then executed a search warrant for Mr. Turner's residence. The remaining Percodan tablets were discovered outside Mr. Turner's garage. Inside the house, the police recovered a total of 43.54 grams of methamphetamine and enough equipment, chemicals and precursors to manufacture between 1.5 and 2.8 kilograms of methamphetamine. The police also found four false-bottom cans, small plastic baggies identical to the one seized from Mr. Shaw on the night of his arrest, and a micro-seal device for sealing the baggies. A nine millimeter handgun and ammunition clip were seized from Mr. Turner's master bedroom. The firearm had been hidden in a mattress, and the ammunition clip was found in a dresser a few feet away. Approximately 29 grams of methamphetamine, in three separate packages, were seized from the bedroom. Also present in the bedroom were a false-bottom can, several pounds of a methamphetamine precursor, an electronic pH meter, and a large glass mixing jar with a mixing knife. The mixing jar and knife tested positive for methamphetamine residue.

### 3.

After indictment, Mr. Turner filed a motion to sever the two counts. Mr. Turner took the position that joinder of the two counts was improper under Federal Rule of Criminal Procedure 8 or, in the alternative, that he was entitled to a severance under Rule 14. The district court denied this motion and, on April 12, 1995, a jury found Mr.

Turner guilty on both counts of the indictment. During sentencing, Mr. Turner objected to the amount of methamphetamine attributed to him as intended for distribution; he claimed that much of the methamphetamine found at his residence was intended for personal use. Mr. Turner also filed a motion asking the district court to declare the sentencing scheme for methamphetamine unconstitutional. The district court overruled each of these objections. The court also imposed, over Mr. Turner's objection, a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon. Mr. Turner was sentenced to 92 months in prison and a five-year term of supervised release. In this appeal, he seeks review of the various rulings of the district court.

## II

## DISCUSSION

### 1.

Mr. Turner asserts that the evidence adduced at trial is insufficient to support his conviction on the conspiracy charge alleged in Count I of the indictment. In reviewing a defendant's challenge to the sufficiency of evidence on appeal, we consider the evidence presented at trial in the light most favorable to the government. *United States v. Monroe*, 73 F.3d 129, 131 (7th Cir. 1995). If any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt, the conviction will be upheld. *United States v. South*, 28 F.3d 619, 626 (7th Cir. 1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We shall reverse a conviction "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992).

Under 21 U.S.C. § 846, a conspiracy is a confederation of two or more individuals formed for the purpose of committing, by their joint efforts, a criminal act prohibited by the Controlled Substances Act. *United States v. Larkins*, 83 F.3d 162, 165 (7th

Cir.1996); *United States v. Montoya*, 891 F.2d 1273, 1286 (7th Cir.1989). In order to prove a conspiracy conviction, the government must provide substantial evidence that a conspiracy existed and that the defendant knowingly agreed to join that conspiracy. *Larkins*, 83 F.3d at 166. The government may establish each element of a conspiracy through circumstantial evidence. *Id.* With respect to the first element, an agreement, the government need not establish a formal agreement to conspire. *United States v. Hickok*, 77 F.3d 992, 1005 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). Rather, "the jury properly may find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." *Id.* (quoting *United States v. Mojica*, 984 F.2d 1426, 1432 (7th Cir.), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993)).

■ Before turning to an examination of the evidence presented at trial, we address the government's assertion that, because Mr. Turner failed to move for a judgment of acquittal at the close of all the evidence or within the seven-day period following the verdict as provided for in Federal Rule of Criminal Procedure 29(c), *see South*, 28 F.3d at 626 & n. 3, he has waived any challenge to the sufficiency of the evidence supporting his conviction and may obtain a reversal only if he demonstrates "a manifest miscarriage of justice." *See, e.g., Hickok*, 77 F.3d at 1002; *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir.1995). The government correctly states the rule, which is well established in this circuit. *See South*, 28 F.3d at 626 (collecting cases).

■ Even if the heightened "manifest miscarriage of justice" standard does not apply, however, Mr. Turner's challenge to the sufficiency of the evidence must fail. Count I of the indictment alleges that Mr. Turner conspired, "with others known and unknown to the grand jury," to possess methamphetamine with the intent to distribute and to distribute methamphetamine. R.2 at 1. The conspiracy is alleged to have lasted from October 1991 through January 1992. *Id.* The

jury heard evidence that, during this time frame, Mr. Turner received three shipments of methamphetamine from the State of Washington, where he once had lived and where he had learned to manufacture methamphetamine. One of the shipments also contained $10,000 in cash. These three shipments arrived at the Brice residence and, on each occasion, Dennis Brice accepted the shipment from the carrier and then handed it over to Mr. Turner. The jury was entitled to conclude that the Brices had conspired with Mr. Turner to facilitate his drug trade. The jury was entitled to conclude that, although Mr. Turner ultimately exercised dominion and control over the contents of the packages, Dennis Brice accepted each of the shipments from Washington on Mr. Turner's behalf.

In addition to this evidence, the government presented evidence of events, occurring outside the temporal scope of the conspiracy, that nevertheless provides additional circumstantial support for the inference that Mr. Turner participated in the conspiracy alleged in Count I. *See Hickok*, 77 F.3d at 1005 (noting that conspiracy may be proven by inferences drawn from the totality of the defendant's conduct). The jury heard evidence that Mr. Turner: (1) manufactured methamphetamine; (2) packaged methamphetamine for shipment to Washington; and (3) asked Dennis Brice to sell methamphetamine for him. From this evidence, and having considered the "relationship of the parties, their overt acts, and the totality of their conduct," *id.*, the jury rationally could have concluded that Mr. Turner conspired with Dennis Brice—and with other individuals in Washington—to possess methamphetamine with the intent to distribute and to distribute methamphetamine. Accordingly, Mr. Turner's challenge to the sufficiency of the evidence supporting his conviction on Count I of the indictment must fail.

### 2.

Having disposed of Mr. Turner's submission with respect to the sufficiency of the evidence, we now turn to his contentions with respect to the proceedings in the district court.

a.

 Mr. Turner first challenges the district court's joinder of Counts I and II of the indictment and its subsequent refusal to sever the two counts. Whether joinder is permitted by Rule 8 of the Federal Rules of Criminal Procedure is a question of law and, accordingly, subject to plenary appellate review. *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir.1994); *see United States v. Koen*, 982 F.2d 1101 (7th Cir.1992). If joinder is proper as an initial matter, we shall overturn the district court's ruling on Mr. Turner's severance motion "only upon a showing of a clear abuse of discretion." *United States v. Pulido*, 69 F.3d 192, 207 (7th Cir.1995); *see Coleman*, 22 F.3d at 134 (noting that Rule 14 severance decisions necessarily involve an exercise of discretion best informed by the observations and experience of the trial court). To establish that the district court abused its discretion in refusing to sever the two counts, Mr. Turner must show that he suffered "actual injury" resulting from the denial of his motion. *Pulido*, 69 F.3d at 207 (quoting *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989)). In other words, Mr. Turner must show that he was unable to obtain a fair trial without a severance; it is not enough to show that a separate trial would have offered him a better chance for an acquittal. *Id.; see United States v. Stillo*, 57 F.3d 553, 557 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995).

Federal Rule of Criminal Procedure 8(a) permits two or more offenses to be charged in the same indictment if, among other reasons, the offenses charged are "of the same or similar character." Fed.R.Crim.P. 8(a). Mr. Turner asserts that the indictment against him fails to satisfy this requirement because the offenses charged in Counts I and II are not alleged to have occurred over a relatively short period of time, because the evidence as to each count does not overlap, and because the indictment fails to allege that the offenses are related. In support of this submission, Mr. Turner notes that Count II charges a substantive offense, involving proof of discrete historical facts, that is alleged to have occurred more than fourteen months after the conspiracy charged in Count I.

 Rule 8(a) requires nothing more than the similarity of the offenses to be joined. *Coleman*, 22 F.3d at 131. In some cases, this court has noted that offenses are "of the same or similar character" if "the counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps." *Koen*, 982 F.2d at 1111; *United States v. Shue*, 766 F.2d 1122, 1134 (7th Cir.1985). As we explained in *Coleman*, however, the "short-period-of-time/evidence-overlap" formula is not the exclusive measure of whether "same or similar" offenses are properly joined. *Coleman*, 22 F.3d at 131–34. Noting that the similarity of character of two offenses does not depend significantly upon their separation in time, we held that a literal reading of Rule 8(a) requires a comparison of the offenses charged in the indictment for "categorical, not evidentiary, similarities." *Id.* at 133.[2] Thus, "if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned." *Id.; see United States v. Walls*, 80 F.3d 238, 243 (7th Cir.1996).

 Applying this standard to the indictment returned against Mr. Turner, we conclude that the district court properly joined Counts I and II for trial. Count I charges Mr. Turner with participation in a conspiracy to possess methamphetamine, and Count II charges him with the substantive offense of possessing methamphetamine with intent to distribute. Even though Mr. Turner is alleged to have committed the substantive offense outside the temporal scope of the conspiracy, the two offenses are categorically related. The indictment alleges the violation of two closely-related statutory prohibitions, and each count involves the same controlled

---

2. In *Coleman*, we provided the following example: "Two armored car robberies committed months apart are offenses of same or similar character; possessing five kilograms of cocaine and defrauding a bank, even if they occur on the same day, are not." 22 F.3d at 133.

substance. *See Coleman,* 22 F.3d at 133 n. 10 ("The offenses need not be of identical statutory origin in order to be *similar,* but their correspondence in type is obviously central to their proper joinder on this ground.") (citing *United States v. Werner,* 620 F.2d 922, 926–27 (2d Cir.1980)). In our view, therefore, the offenses charged in the indictment are "of the same or similar character," and joinder of the two counts was proper under Rule 8(a).

Even if the counts were joined properly as an initial matter, Mr. Turner submits, the district court abused its discretion when it denied his motion to sever Counts I and II pursuant to Federal Rule of Criminal Procedure 14.[3] In support of this position, Mr. Turner claims to have been prejudiced by a spillover of guilt and evidence between the two counts. He maintains, moreover, that joinder of the two counts failed to produce any countervailing judicial efficiencies.

▮▮▮▮ Our precedent recognizes that the risk of unfairness is elevated in a trial where the joinder of two or more offenses is predicated on their "same or similar character." *See, e.g., Coleman,* 22 F.3d at 134. Noting the relative lack of efficiency gains in such cases, we have emphasized that "the district courts should be especially watchful for possible jury confusion, illegitimate cumulation of evidence or other sources of prejudice not worth the reduced efficiency gains of a joint trial." *Id.* However, this determination is left to the sound discretion of the district court, *see Zafiro v. United States,* 506 U.S. 534, 541, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993), and, under the circumstances of this case, we are unable to conclude that the district court abused its discretion in assessing the risk of prejudicial spillover or juror confusion in Mr. Turner's trial.

▮▮▮▮ In order to succeed on his claim of "prejudicial spillover," Mr. Turner must overcome the dual presumptions that a jury will capably sort through the evidence and will follow limiting instructions from the court to consider each count separately. *See Stillo,* 57 F.3d at 557. Mr. Turner has failed to clear either hurdle. First, the risk of jury confusion was minimal. The trial lasted little more than one day and, because the evidence pertaining to each count was straightforward, there is every reason to believe that a properly instructed jury could keep separate the evidence relevant to each. The proof at trial involved discrete historical events, and "the evidence as to each [count] was anything but excessive or confusing." *Coleman,* 22 F.3d at 135. As in *Coleman,* moreover, the key issue contested by the defense—Mr. Turner's intent to distribute—was the same for both counts. Accordingly, "the jury did not have to grapple with the application of widely variant governing legal principles." *Id.*

▮▮▮▮ As for the danger of prejudicial spillover, we note that the district court properly instructed the jury to consider each count separately. In rejecting similar challenges, our cases have noted that such limiting instructions are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *Pulido,* 69 F.3d at 209 (quoting *United States v. Berardi,* 675 F.2d 894, 901 (7th Cir.1982)). Given these instructions and the straightforward nature of the proof at trial, a jury easily could have compartmentalized the evidence relating to each count. Accordingly, the district court did not abuse its discretion in refusing to sever the two counts.

b.

Mr. Turner next submits that the district court erroneously refused to instruct the jury that, with respect to the conspiracy charged in Count I, a buyer-seller relationship is insufficient to establish membership in the conspiracy. Mr. Turner first presented the proposed buyer-seller instruction at the pretrial conference. The magistrate judge recommended that the following language be in-

---

3. Rule 14, entitled "Relief from Prejudicial Joinder," provides in relevant part:

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. Fed.R.Crim.P. 14(a).

cluded in the jury instructions: "Mere proof of the existence of a buyer-seller relationship is not sufficient to prove that the defendant is a co-conspirator in the drug conspiracy." R.46. At trial, Dennis Brice had testified that he received small quantities of drugs in exchange for accepting the packages sent from Washington. At the jury instruction conference, the district court rejected the buyer-seller instruction. Mr. Turner asserts that he was entitled to this instruction because Dennis Brice testified that he received methamphetamine in exchange for receiving the UPS packages at his home.

■■■■■ We employ a four-part test to determine whether a defendant is entitled to an instruction presenting a theory of defense:
[A] defendant is entitled to an instruction presenting a theory of defense if: (1) the defendant proposed a correct statement of the law, (2) the evidence in the case supports the theory of defense, (3) the theory of defense is not part of the charge, and (4) the failure to include the instruction would deny the defendant a fair trial.
*United States v. Schulte*, 7 F.3d 698, 700 (7th Cir.1993). As with theory of defense instructions generally, a defendant is entitled to have a buyer-seller instruction only if the theory is supported by the evidence. *United States v. Canino*, 949 F.2d 928, 941 (7th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). "A district court's determination that a defendant has failed to present sufficient evidence to become entitled to a jury instruction on a theory of defense is reviewed de novo." *United States v. Bastanipour*, 41 F.3d 1178, 1183–84 (7th Cir.1994). "Each drug conspiracy case must be analyzed according to its specific facts to determine whether a buyer-seller instruction is appropriate." *Canino*, 949 F.2d at 941. In making this fact-intensive review, "a court must consider whether the defendant has put forth the defense during trial." *United States v. Douglas*, 818 F.2d 1317, 1321 (7th Cir.1987).

It is clear that the instruction formulated by the magistrate judge is a correct statement of the law. *See United States v. Lechuga*, 994 F.2d 346 (7th Cir.) (en banc), *cert.*

*denied*, 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). We agree with the district court, however, that, when the record is viewed as a whole, the evidence does not support the giving of the buyer-seller instruction in this case.

■■■■ The purpose of the "mere buyer-seller instruction" is to ensure that the jury understands that an agreement to purchase the contraband, without any other agreement to achieve another criminal objective, is not a conspiracy. *Id.* at 349. The crime alleged in Count I of the indictment was conspiracy on the part of Mr. Turner to possess the contraband in question with intent to distribute. A conspiracy is basically an agreement to commit a criminal act—the possession of the contraband with the intent to distribute it. *Id.* According to Dennis Brice's testimony, he accepted, on several occasions, packages containing the contraband at his home. Whether he performed this service gratuitously or for payment in the form of a certain amount of the contraband, he was not a simple buyer of the commodity as contemplated by the instruction. Rather, he affirmatively assisted in the commission of the substantive crime of possession with intent to distribute by facilitating the criminal activity of Mr. Turner. In short, the consideration which he tendered for the receipt of the drugs was not a consideration unrelated to the conspiracy such as currency or even services unrelated to the conspiracy. Rather, he exchanged affirmative support for the commission of the underlying crime. See *United States v. Herrera*, 54 F.3d 348, 354 (7th Cir.) (upholding district court's refusal to give buyer-seller instruction where the alleged co-conspirators were not on opposite sides of the single drug transaction), *cert. denied*, — U.S. —, 116 S.Ct. 192, 133 L.Ed.2d 128 (1995); *see also United States v. Ivy*, 83 F.3d 1266, 1285–86 (10th Cir.1996) (noting that the purpose of the buyer-seller rule is to separate consumers, who generally do not share the criminal objective, from others who do further the objective of the conspiracy). Activity such as Mr. Brice's, illegal without respect to the purchase of the contraband, cannot render one a "mere buyer" of the commodity. Rather, the evidence

showed "an agreement with a separate criminal object," *Lechuga*, 994 F.2d at 349—securing the possession of the contraband for later distribution. *See id.* at 347 ("What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself."); *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir.1991) (explaining that buyer-seller instruction is designed to address the situation where there is no "criminal objective beyond that already being accomplished by the [sale] transaction"). Accordingly, the district court was correct in determining that the instruction was not reasonably raised by the evidence. By his own admission, Brice was far more than a mere purchaser; he had affirmatively supported the illegal activity that was the object of the conspiracy.

### 3.

We now turn to Mr. Turner's contentions with respect to the imposition of sentence.

### a.

On appeal, Mr. Turner renews his challenge to the constitutionality of the sentencing scheme for methamphetamine. Specifically, he challenges the constitutionality of the 10:1 ratio, established in 21 U.S.C. § 841(b)(1)(B)(viii) and implemented by U.S.S.G. § 2D1.1(c), between methamphetamine (actual) and those substances and mixtures that contain methamphetamine. Because this penalty scheme is subject to arbitrary enforcement, he asserts, these provisions lack the rational basis mandated by the

Due Process and Equal Protection clauses of the Fourteenth Amendment. We review Mr. Turner's challenge to the constitutionality of these provisions de novo. *United States v. Brady*, 895 F.2d 538, 539 (9th Cir. 1990).

21 U.S.C. § 841(b)(1)(B)(viii) imposes an enhanced penalty for violations of section 841(a)(1) which involve "10 grams or more of methamphetamine . . . or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." 21 U.S.C. § 841(b)(1)(B)(viii). The Sentencing Guidelines' "Drug Quantity Table," *see* U.S.S.G. § 2D1.1(c), also equates one gram of "methamphetamine (actual)" with 10 grams of a mixture containing methamphetamine (hereinafter "methamphetamine [mixture]").[4] Mr. Turner asserts that this penalty scheme is subject to arbitrary application by courts and by those who compile the presentence reports. According to Mr. Turner, 21 U.S.C. § 841(b)(1)(B)(viii) and U.S.S.G. § 2D1.1(c) allow the sentencing court to determine an offender's base offense level using either the provision for methamphetamine (actual) or the provision for methamphetamine [mixture]. Assuming that the methamphetamine in question is more than 10% pure, he explains, the length of an offender's sentence depends upon which guideline—the guideline for methamphetamine (actual) or the guideline for methamphetamine [mixture]—the sentencing court elects to use to calculate the base offense level.[5] Mr. Turner submits that, because these penalty provisions permit this "arbitrary choice,"

---

**4.** The Drug Quantity Table establishes base offense levels for drug trafficking offenses using a graduated scale that increases the offense level for each incremental increase in the quantity of drugs involved. For methamphetamine, the mixture to purity ratio at each level of the Drug Quantity Table is 10:1; it takes one-tenth the quantity of methamphetamine (actual) to yield the same offense level as a mixture or substance containing methamphetamine. *See generally United States v. Bogusz*, 43 F.3d 82, 86–87 (3d Cir.1994) (discussing the Sentencing Guidelines' treatment of methamphetamine), *cert. denied*, —— U.S. ——, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995); *United States v. Brown*, 921 F.2d 785, 789 & n. 2 (8th Cir.1990) (discussing the Drug Quantity Table's approach to methamphetamine).

**5.** Mr. Turner provides the example of an individual convicted of possessing fifty grams of 50% pure methamphetamine with the intent to distribute. If the guideline for a methamphetamine [mixture] is applied, the offender's sentence will be calculated using a base offense level of 20. If, on the other hand, the guideline for methamphetamine (actual) is applied to the amount of pure methamphetamine in the mixture (50 grams × 50% purity = 25 grams of pure methamphetamine, *see* U.S.S.G. § 2D1.1(c) note *), the result is a base offense level of 26. For an individual in criminal history category I, the difference between base offense levels 20 and 26 increases the maximum sentence by 37 months.

with no standards for courts to use in determining which provision to apply, the sentencing scheme for methamphetamine is unsupported by a rational basis.

██ We agree with the district court that the 10:1 ratio is supported by a rational basis because the pure product is more concentrated and can be cut into larger quantities for resale. *See United States v. Bogusz*, 43 F.3d 82, 86–87 (3d Cir.1994), *cert. denied*, ── U.S. ──, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995); *cf. United States v. Lawrence*, 951 F.2d 751, 755 (7th Cir.1991) (holding that 100:1 ratio for cocaine base and cocaine is rationally related to the dangerousness of the former). Methamphetamine, as it is produced through normal chemical processes, contains a number of impurities that can be removed through further processing. *Bogusz*, 43 F.3d at 87. The finished product can be cut into larger quantities for resale. *Id.* Accordingly, the sentencing scheme for methamphetamine "punishes more severely the sophisticated cooks who could otherwise manipulate the Guidelines by producing smaller quantities of more concentrated methamphetamine." *Id.* We are unable to conclude that Congress lacked a rational basis when it elected to punish drug offenses involving pure methamphetamine more severely.

Mr. Turner's alternative constitutional challenge—that the sentencing scheme for methamphetamine lends itself to arbitrary application by sentencing courts—rests on a faulty premise. His theory depends upon the proposition that the sentencing scheme permits the sentencing court to set an offender's base offense level using *either* the weight of the pure methamphetamine in a mixture or the total weight of the mixture. However, the Sentencing Guidelines do not give sentencing courts the option Mr. Turner describes. An explanatory footnote to U.S.S.G. § 2D1.1(c) provides:

> The terms "PCP (actual)" and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example,

a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual) or methamphetamine (actual), *whichever is greater.*

*See* U.S.S.G. § 2D1.1(c) n.* (1995) (emphasis added). Contrary to Mr. Turner's suggestion, therefore, the Sentencing Guidelines do not establish two separate methods of establishing the base offense level, and the length of an offender's sentence does not depend upon the guideline "arbitrarily chosen" by the sentencing court.[6]

b.

Mr. Turner next asserts that the district court erred in calculating the amount of methamphetamine used to determine his base offense level. According to Mr. Turner, the district court should have excluded the amount of methamphetamine intended for personal use (28.07 grams by his estimation) and calculated his base offense level using only the 11.51 grams of methamphetamine that he actually distributed.

Mr. Turner submits that the district court erred when it concluded that "all of the controlled substances in this case" were intended for distribution. In support of his position that most of the methamphetamine found at his residence was intended for personal use, Mr. Turner invites our attention to various documents explaining the highly addictive and tolerance-building nature of methamphetamine. He also points to Dennis Brice's testimony that, in late 1991 and early 1992, the Brices smoked methamphetamine with Mr. Turner on an almost daily basis. Dennis Brice further testified that, toward the end of this time period, he (Brice) had smoked methamphetamine as often as three or four times per day.

---

6. Citing counsel's "previous experience" that the probation and parole office for the Western District of Wisconsin does not determine the purity of methamphetamine to calculate the weight of methamphetamine (actual), Mr. Turner asserts an equal protection challenge as well. Absent any claim that an unauthorized method was applied in Mr. Turner's case, however, his Equal Protection challenge to the sentencing scheme necessarily fails.

The district court assumed, without deciding, that the government has the burden of proving that all of the methamphetamine found at Mr. Turner's residence was intended for distribution. The court took the view that, even making this assumption, the government had established that all of the methamphetamine attributable to Mr. Turner was intended for distribution. Noting that Mr. Turner had given up methamphetamine very quickly after his arrest, the court discounted the seriousness of Mr. Turner's habit. In any event, the court reasoned, the total amount of methamphetamine attributable to Mr. Turner was much greater than even a serious addict could consume.

 There is substantial evidence supporting the district court's conclusion that Mr. Turner intended to distribute the methamphetamine found at his residence. The police found, in several separate containers, a total of 43.54 grams of pure methamphetamine. Additionally, the searchers recovered the following chemical components and equipment: approximately 20.5 pounds of ephedrine (approximately 130,670 individual tablets), a liquid solution containing methamphetamine and phenylacetone, an electric pH meter, funnels, strainers and a stove. Ephedrine and phenylacetone are precursors used to manufacture methamphetamine. The quantity of precursor material found at Mr. Turner's residence is such that it could have been used to manufacture between 1.5 and 2.8 kilograms of methamphetamine. The police also found items consistent with storing, transporting and packaging methamphetamine: four false-bottom cans similar to those sent to the Brice residence in late 1991 and early 1992, a number of small plastic baggies and a micro-seal device used to seal plastic baggies. Our case law makes clear that "[i]ntent to distribute can be inferred from the possession of a quantity of drugs larger than needed for personal use." *United States v. Curry*, 79 F.3d 1489, 1498 (7th Cir.1996) (quoting *United States v. Maholias*, 985 F.2d 869, 879 (7th Cir.1993)). Here, the district court was certainly entitled to conclude that the amount of methamphetamine and precursor chemicals found at Mr. Turner's residence surpassed the evidence quantifying his own personal consumption.

The district court was also entitled to discount Dennis Brice's testimony that Mr. Turner was a heavy drug user. Although Brice testified that he smoked methamphetamine with Mr. Turner on an almost daily basis, this testimony addressed a time period more than a year before the search of Mr. Turner's home. The only testimony on the frequency of use, moreover, concerns Dennis Brice's own habit—not Mr. Turner's. Under these circumstances, the district court's determination that 39.58 grams of methamphetamine ought to be used to set Mr. Turner's base offense level is certainly not clearly erroneous. The record supports the district court's conclusion that the drugs discovered during the search were "part of the same course of conduct" or "common scheme" as drugs intended for distribution for purposes of the relevant conduct determination under U.S.S.G. § 1B1.3(a)(2).

c.

 We now consider whether the district court erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(1). That section provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed." We review the district court's factual findings supporting the enhancement for clear error. *United States v. Anderson*, 61 F.3d 1290, 1303 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *United States v. Jones*, 54 F.3d 1285, 1294 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 263, 133 L.Ed.2d 186 (1995).

An application note to section 2D1.1 states that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1, comment.(n.3). Such a situation is certainly not the case here. When the police searched Mr. Turner's residence, they seized a nine millimeter handgun from the master bedroom. An ammunition clip was stored in

a nearby dresser. The weapon was found in the same room as 29 grams of methamphetamine and equipment that could have been used to manufacture and package the drug: five pounds of a methamphetamine precursor, an electronic pH meter, a false-bottom container, and a glass mixing jar containing methamphetamine residue.

■ When a nine millimeter handgun is found in the defendant's bedroom near a large quantity of methamphetamine and equipment that could have been used to manufacture and package methamphetamine, it is not "clearly improbable" that the weapon was connected with the offense. It is widely acknowledged that guns are "tools of the trade" in the drug business, *United States v. Armond*, 920 F.2d 480, 482–83 (7th Cir.1990), and the district court certainly could have found that a firearm recovered from Mr. Turner's room, which he apparently used to manufacture methamphetamine, was possessed during the offense. *United States v. Banks*, 987 F.2d 463, 468 (7th Cir.1993); *see United States v. Ewing*, 979 F.2d 1234, 1238 (7th Cir.1992) ("The seizure of a firearm in close proximity to illegal drugs is considered powerful support for the inference that the firearm was used in connection with the drug trafficking operation."). Under these circumstances, the district court's determination that Mr. Turner possessed the weapon during the offense is not clearly erroneous.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED