**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony D. TAYLOR, Defendant–Appellant.**

**No. 96–3952.**

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1997.

Decided June 19, 1997.

270

Deirdre A. Durborow (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, plaintiff-appellee.

Greg Roosevelt (argued), Edwardsville, IL, for defendant-appellant.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury found Anthony Dawon Taylor guilty of conspiring to distribute and distributing crack cocaine (cocaine base) in the Southern Illinois town of Cairo. *See* 21 U.S.C. §§ 846, 841(a)(1). The district court ordered Taylor, a career offender, to serve a prison term of 360 months. R. 37. Taylor appeals, contending that the evidence was insufficient to establish his guilt on the conspiracy charge, that the evidence did not support the district court's finding that he was responsible for distributing at least 900 grams of crack, and that the court abused its discretion in denying him a continuance so that he could call his charged co-conspirator, Steven Adams, as a witness at his trial. Finding no merit in any of these arguments, we affirm Taylor's conviction and sentence.

1. Those two charges stemmed from Taylor's sale of crack cocaine to the government's informant,

**I.**

A conspiracy charge requires proof both that a conspiracy existed and that the defendant knowingly participated in that conspiracy. *United States v. Hightower*, 96 F.3d 211, 214 (7th Cir.1996). The heart of the conspiracy charge is the agreement to commit a crime, here the distribution of a narcotic. *United States v. Lechuga*, 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied*, 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993); *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991); *see also United States v. Turner*, 93 F.3d 276, 281 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996); *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir.1996). The agreement need not be formal, and the government may establish that agreement, as it may the other elements of the charge, through circumstantial evidence. *Turner*, 93 F.3d at 282. Nevertheless, the fact of the conspiracy as well as the defendant's membership in it must be established with substantial evidence. *Hightower*, 96 F.3d at 214; *Turner*, 93 F.3d at 282; *Larkins*, 83 F.3d at 166.

As we assess the sufficiency of the evidence underlying Taylor's conspiracy conviction, we are obligated to consider that evidence in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). So long as any rational factfinder could have found the essential elements of the offense to have been established beyond a reasonable doubt *(see ibid.)*, we must affirm the conviction. *E.g., Turner*, 93 F.3d at 281.

Although Taylor concedes that the evidence was sufficient to establish his involvement in narcotics distribution (and thus he does not challenge his conviction on either of the two distribution charges[1]), he contends that the evidence establishes no more than a buyer-seller relationship between him and his supplier, Carletus Jackson. *See Lechuga*, 994 F.2d at 349–50. However, after reviewing the record, we are satisfied that a reason-

Daniel McClendon, on January 9 and 12, 1996. These transactions were captured on audiotape.

able jury could infer from the evidence that Taylor conspired with both Jackson and Steven Adams to distribute cocaine in Cairo in 1992 and 1993.

During the life of the conspiracy, Jackson himself lived in Paducah, Kentucky, which is approximately thirty miles from Cairo. Jackson (a.k.a."Bubba") had his own sales operation in Paducah, but he had an evident interest in expanding his territory. In December 1991, Jackson had recruited Adams (known on the street as "Stevie–O") to move from Chicago to Cairo so that Adams might distribute crack cocaine for Jackson there. Eventually, however, Jackson had cut off Adams' supply of cocaine because Adams was not a particularly motivated distributor and kept coming up short on the money he owed Jackson for the cocaine. When Adams asked Jackson to let him "set up shop" again in Cairo, Jackson balked. Eventually, however, Adams came up with a plan that was satisfactory: Jackson would supply the cocaine not to Adams but to Taylor (known on the street as "Fuzzy"), who could keep an eye on Adams. Adams introduced Taylor to Jackson in or about December 1992, and the two came to an agreement. Over the ensuing months (January through March, 1993), Jackson supplied Taylor with nine-ounce quantities of powder cocaine on four occasions. Jackson charged Taylor $10,800 for each nine-ounce quantity. But Taylor did not pay him on delivery; instead, Jackson was paid at a later date from the money Taylor made distributing the cocaine. Typically, Adams would accompany Taylor when he traveled to Paducah to retrieve the cocaine and/or to drop off the payment. Jackson found the arrangement to his liking, because Taylor proved himself able to move a greater quantity of cocaine than Adams had been.

Jackson was aware that the powder cocaine he supplied to Taylor was being converted into crack form. Charles Barber, Jackson's brother-in-law, was cooking the cocaine for Taylor, and Jackson knew this because Barber occasionally served as Jackson's driver and would keep Jackson apprised of happenings in Cairo. Jackson even gave Barber a sixteenth or an "eight-ball" of cocaine in return for helping Taylor. Jackson also had occasion to become personally involved in the cooking process. Powder cocaine normally converts to crack cocaine in a one to one ratio, so that Taylor could expect to end up with the same quantity after the powder was cooked into crack form. In that respect, Jackson heard no complaints from Taylor about the first nine-ounce quantity of cocaine he sold to Taylor. But after the second sale, Taylor complained that several grams were lost in the cooking process. When the third batch was cooked, Jackson drove to Cairo so that he could supervise the cooking himself and make sure that Barber, whom he suspected of stealing, wasn't the explanation for the loss. After witnessing the cooking first hand, however, Jackson was satisfied that there was a problem with the cocaine. He subsequently complained to his own supplier, and after that, there were no further problems.

From all of this, one could rationally infer that Taylor and Jackson were more than simply buyer and seller. First, Jackson wanted a distributor in Cairo who could move cocaine in greater amounts than the two or three ounce quantities Adams had typically distributed (Trial Tr. June 4, 1996 T–2 at 89–90, 90–91); and this tends to show that Jackson was more interested in a continuous, mutually profitable relationship with his distributor than a mere seller might be. *See United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir.1997) (citing *United States v. Clay*, 37 F.3d 338, 341 (7th Cir.1994)). Second, and in that same vein, Jackson was willing to front relatively valuable amounts of powder cocaine (in excess of $10,000 on each occasion) and await payment from the income Taylor earned on the distribution, which gave him an obvious stake in Taylor's sales. Trial Tr. June 4, 1996 T–2 at 71–72; *see, e.g., United States v. Hubbard*, 61 F.3d 1261, 1278 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1268, 134 L.Ed.2d 216 (1996). Third, Jackson kept himself apprised of Taylor's operation through his brother-in-law, whom he paid with cocaine for his services as a "cook" to Taylor. Trial Tr. June 4, 1996 T–2 at 85. Fourth and finally, when Taylor complained that some of the cocaine was being lost in the conversion to crack, Jackson

drove to Cairo and oversaw the cooking of the third batch to make sure his brother in law Barber was not the source of the problem. Trial Tr. June 4, 1996 T–2 at 76. It is plausible to infer from these facts that Taylor and Jackson (not to mention Adams, who brought the two of them together), had an agreement that extended beyond the individual sales of cocaine by Jackson to Taylor and encompassed distribution of crack cocaine in Cairo. See Hall, 109 F.3d at 1232 (citing Lechuga, 994 F.2d at 347). We therefore reject Taylor's challenge to the sufficiency of the evidence underlying his conspiracy conviction.

## II.

■■■■ Taylor also challenges the district court's determination that his relevant conduct included responsibility for at least 900 grams of crack cocaine, a finding that put Taylor's base offense level at thirty-six. See U.S.S.G. § 2D1.1(c)(2) (Nov.1995). This is a finding that we review for clear error (e.g., Hall, 109 F.3d at 1233); and because the drug quantity table assigns a base offense of thirty-six to narcotics-related conduct involving from 500 grams to 1.5 kilograms of cocaine base (see U.S.S.G. § 2D1.1(c)(2)), what we are most interested in is whether the evidence permits the attribution of at least 500 grams of crack to Taylor.[2] Judge Beatty saw "no way that you can come up with anything below 500 grams" (Sentencing Tr. Nov. 8, 1996 at 36) and upon review of the record, we agree with him. At sentencing,

the government identified several quantities of cocaine that might be attributed to Taylor beyond the cocaine that Jackson had supplied to him (see Sentencing Tr. Oct. 4, 1996 at 11–18), but ultimately the district court focused on the quantities of cocaine that Jackson had sold to Taylor (see Sentencing Tr. Nov. 8, 1996 at 29, 36). The court arrived at the figure of 900 grams by assuming that Jackson supplied four, nine-ounce quantities of powder cocaine to Taylor that were converted to crack cocaine in a proportion of twenty-five grams of crack for each ounce of powder cocaine (a loss of slightly more than three grams per ounce of powder). Id. at 29.[3] Taylor contends in the first instance that it is inappropriate to assume that Jackson actually supplied him with cocaine on four occasions, given his testimony at trial that it was either three or four. See Trial Tr. June 4, 1996 T–2 at 77, 81. However, Jackson testified at sentencing and was asked about that on both direct and cross-examination; both times he insisted that there were four sales to Taylor, not three. Sentencing Tr. Nov. 8, 1996 at 6 (direct), 18 (cross). The district court was entitled to credit that testimony. Taylor also argues that it is improper to assume that all of the powder cocaine was converted to crack. Jackson himself oversaw only the cooking of the third batch, Taylor emphasizes, and even if we assume that the second batch was also cooked into crack form based on Taylor's complaint that it was not converting in a one to one ratio, that still leaves questions about the first and fourth

---

2. Arguably, as this court pointed out at oral argument, we need only be satisfied that the evidence supports a finding that Taylor was responsible for a far lower amount, namely fifty grams. Although the 900–gram finding put Taylor's base offense level at thirty-six, the career offender provision of the guidelines ultimately required an offense level of thirty-seven based on his conviction under a statute (21 U.S.C. § 841(a)(1); see also 21 U.S.C. § 846) that carries a maximum penalty of life imprisonment when more than fifty grams of cocaine base were involved. See 21 U.S.C. § 841(b)(1)(A)(iii); U.S.S.G. § 4B1.1(A). So even if the district court had found Taylor responsible for only seventy-five grams of crack cocaine, for example, which corresponds to a base offense level of thirty-two (see U.S.S.G. § 2D1.1(c)(4)), in the end his offense level still would have been thirty-seven given his status as a career offender.

3. Jackson testified that the powder cocaine he supplied to Taylor on the second and third occasions was converting to crack at a rate of approximately twenty-three or twenty-four grams per ounce. Sentencing Tr. Nov. 8, 1996 at 4. The district court used a higher number—twenty-five grams—but that may have been based on the assumption that the first and fourth batches of cocaine that Jackson supplied converted fully at a rate of twenty-eight grams per ounce, given that Jackson heard no complaints about those batches. See id. at 12–13, 18. Yet, even if we assume that every ounce of powder cocaine that Jackson supplied to Taylor yielded only twenty-three grams of crack, the total (828) would still substantially exceed the floor of 500 grams that put Taylor's base offense level at thirty-six.

batches. But we find the district court's assumption reasonable. That inference is supported in particular by the number of witnesses who testified that they purchased cocaine in *crack,* not powder form from Taylor throughout the time frame of the conspiracy (*e.g.,* Trial Tr. June 3, 1996 T–1 at 5–7; Trial Tr. June 4, 1996 at 3–4, 14–15, T–2 at 24–25, 48–50), by Jackson's testimony that he had arranged for his brother-in-law Barber to help Taylor convert the cocaine to crack and compensated him for doing so (Trial Tr. June 4, 1996 T–2 at 84–85; *see also* Sentencing Tr. Nov. 8, 1996 at 5), and by the utter lack of evidence that Taylor ever distributed anything other than crack cocaine. Finally, Taylor suggests that the testimony of Jackson and other witnesses was incredible given their prior felony convictions, their efforts to cooperate with the government in prosecuting him, and in many instances their prior drug use. Credibility questions like these are for the trier of fact to resolve in all but the most extraordinary circumstances. *See Anderson v. Bessemer City, North Carolina,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *United States v. House,* 110 F.3d 1281, 1286 (7th Cir.1997). The circumstances that Taylor cites are by no means unusual, and we are given no reason why the district court was necessarily precluded from crediting Jackson and the other witnesses in making his sentencing determinations. We find no clear error in the district court's drug quantity calculation.

### III.

 Finally, Taylor challenges the district court's refusal to grant him a continuance so that he might attempt to have Steven Adams testify at trial. We review the district court's ruling in this matter for abuse of discretion (*e.g., United States v. Hall,* 35 F.3d 310, 315 (7th Cir.1994)), and we find none here. Taylor made his motion in the midst of trial at the close of the government's case (*see* Trial Tr. June 4, 1996 v. 2 at 81A–83A), arguing that he had not been able to locate and interview Adams (who was incarcerated in Alabama) until the trial had already begun. And not until Carletus Jackson testified, Taylor argues, could he have appreciated the importance of Adams as a witness concerning the purported relationship between himself and Jackson. However, Adams was named as a co-conspirator in the indictment (R. 1 at 1), and we are given no satisfactory explanation as to why his significance could not reasonably have been discerned from the witness statements that were produced to the defense in advance of trial or in what sense Jackson's testimony regarding his relationship with Taylor was a surprise. Moreover, it is not at all clear that Adams (who did testify at sentencing) would have been of any help to Taylor. Jackson's testimony revealed Adams to have played two important roles in the alleged conspiracy: (1) he introduced Jackson and Taylor to one another and proposed that Jackson supply Taylor with cocaine; and (2) he accompanied Taylor to Paducah to obtain cocaine and to reimburse Jackson for that cocaine. *See* Trial Tr. June 4, 1996 T–2 at 73–74, 77–78. At sentencing, Taylor's counsel questioned Adams about the first of these roles, to little avail: Adams responded simply "I don't recall that, sir" when asked if he had brought Taylor and Jackson together. Sentencing Tr. Nov. 8, 1996 at 23. Indeed, on cross-examination, Adams acknowledged that he had been called to testify in another trial and that he had been unable to remember anything that he was asked about on that occasion either. *Id.* at 25. This admission in itself took some prodding: Adams initially was inclined to say that he didn't recall his lack of recollection! *Id.* at 24. In short, whether we assume that Adams truly had something approaching total amnesia or was simply being evasive, his belated testimony discloses nothing helpful to Taylor. On this record, we can discern no prejudice to Taylor in the refusal to grant him a continuance.

### IV.

For the reasons stated, we AFFIRM Taylor's conviction and sentence.