**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John L. CARRAWAY, John H. Bond, et al., Defendants–Appellants.**

**Nos. 94–1938, 94–2023, 94–2326, 94–2327 and 94–2329.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1996.

Decided March 5, 1997.

James Porter (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, for U.S.

John F. Garvey, Jr. (argued), Leritz, Plunkert & Bruning, St. Louis, MO, for John L. Carraway.

V. Clyde Cahill (argued), St. Louis, MO, for John H. Bond.

Eric W. Butts (argued), St. Louis, MO, for James E. Robinson.

Lynn Hirschfeld Brahin (argued), Chicago, IL, for James Rodriquez.

James J. Gomric, Belleville, IL, for Elizabeth Wiggins.

Before COFFEY, KANNE, and ROVNER, Circuit Judges.

PER CURIAM.

Appellants John L. Carraway, John Bond, James E. Robinson, James Rodriquez, and Elizabeth Wiggins were found guilty of conspiring to distribute and to possess with the intent to distribute cocaine and cocaine base, among other narcotics-related offenses. With one exception, we affirm their convictions and sentences.

## I.

The defendants were charged with participating in a conspiracy to distribute cocaine in Washington Park, Illinois, a suburb of East St. Louis. Twenty-seven people were charged as conspirators; twenty-two of them pled guilty. The five defendants before us in this appeal elected to proceed to trial and were found guilty by a jury.

The second superseding indictment alleged a conspiracy to distribute both powder and crack cocaine from May 14, 1990 until at least February 23, 1993. The evidence at trial revealed that the conspirators sold cocaine primarily from two locations in Washington Park: a residence at 2215 North 57th Street, known as the "green house," and a trailer located at 2015 North 59th Place, known simply as the "trailer."

According to the testimony presented at trial, Robert Rodriquez began selling cocaine

outside the home of his brother Jesus Rodriquez in or about the summer of 1991. Eventually, Jesus told Robert that he no longer wished Robert to be selling cocaine in front of his home, and the base of Robert's cocaine trafficking moved to the green house, where Robert lived with Elizabeth Wiggins, who eventually married him. Robert sold cocaine at that location along with Undray Bradley, Trinidad Rodriquez III (Robert's nephew), and Lamont "Red" Oakley, among others.

Domestic problems eventually led Wiggins to depart the green house, and in August 1991 Robert Rodriquez turned the house over to Undray Bradley, who managed cocaine sales from that location until the authorities raided the house and arrested him in February 1993, bringing an end to the conspiracy. Bradley initially obtained the cocaine that he sold at the green house from Rodriquez, but as Rodriquez's sales expanded, Bradley began to acquire cocaine for re-sale from other suppliers, including appellant John Carraway (who had also supplied cocaine to Robert Rodriquez) and, on one occasion, appellant John Bond (one ounce). Terrence Carter, John Bennett, Jr., Trinidad Rodriquez III (among others) assisted Bradley with sales. Business was brisk at the green house. On the witness stand, Bradley described it as a kind of "7–11" among drug houses, open for business twenty-four hours a day, seven days a week. Appellant James Robinson was a frequent customer, purchasing $20 and $50 rocks of crack cocaine from Bradley several times daily.

After leaving the green house, Robert Rodriquez continued his own sales, first at the home of his mother, Rose Rodriquez, and later at the trailer on 59th Place, which he purchased and made the base of his operations. Wiggins, with whom Robert Rodriquez had reconciled, lived with him at the trailer and helped him handle both the cocaine and the cash generated by sales. John Bond and Jackie Wilson were among Rodriquez's principal suppliers at that location. Brian Holley "cooked" the powder cocaine into crack or "rock" form. The sales force included Oakley and Trinidad Rodriquez II (who managed the trailer) as well as Trinidad Rodriquez III, Warrick Scott (who also

served as a door guard), and Earnest Rodriquez. James Robinson and James Rodriquez regularly made purchases for re-sale to their customers. Customers either drove or walked up to the trailer, and they apparently did so in large numbers. In the course of the government's investigation, a pole camera was installed outside the trailer to conduct video surveillance. Over a forty-five day period, the camera recorded more than 4,000 vehicles pulling up to the trailer for brief periods of time—an average of nearly ninety per day. Sales continued at that location until Robert was injured in a motorcycle accident in December of 1992, after which time Wiggins, his wife, made the decision to shut down the operation at that location.

## II.

### A. John L. Carraway (No. 94–1938)

#### 1.

Carraway was named as a defendant in Count 2 of the superseding indictment alone, the conspiracy charge. Several of the defendants who pleaded guilty testified that Carraway supplied the green house with cocaine. Carraway nonetheless contends that the evidence, even when viewed favorably to the government, was insufficient to establish his guilt beyond a reasonable doubt, because the testimony against him "showed substantial inconsistencies and contradictions." Carraway Br. 9. For example, although Undray Bradley (Tr. E 6, 8, 21; II 34), Lamont Oakley (Tr. II 115, 183), Trinidad Rodriquez III (Tr. II 206), John Bennett (Tr. III 113–14, 126), Jesus Rodriquez (Tr. III 200), Terrence Carter (Tr. III 177), and Earnest Rodriquez (Tr. IV 4) each testified that Carraway supplied cocaine to the green house (under the tenure of both Rodriquez and Bradley), other witnesses testified that they had not seen or did not know Carraway. *E.g.*, Tr. III 95 (Warrick Scott), III 137, 166, 168 (Brian Holley). Even some of the witnesses who claimed that Carraway was a supplier (including Bennett and Oakley) confessed that they had never actually seen Carraway hand over any cocaine. Tr. III 115, 122–23 (Bennett); II 185–86 (Oakley); *but see* Tr. III 177 (Carter); II 206 (Trinidad Rodriquez III). Carraway's own

witnesses testified that Carraway was legitimately employed as a tire salesman. Tr. IX 107–08, 116–18, 142–44, 147–50; X 2–4, 6–8, 46–48. On that note, Carraway emphasizes the lack of evidence that he lived an extravagant lifestyle commensurate with what one might expect of a narcotics trafficker.

These were all fine arguments for the jury to consider in assessing the weight of the evidence against Carraway, but they do not suffice to undermine the verdict against him. As an appellate court, we are obliged to consider the evidence, and all permissible inferences that the factfinder might have drawn from it, in the light most favorable to the prosecution. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also, e.g., United States v. Hightower,* 96 F.3d 211, 214 (7th Cir.1996). "If any rational finder of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt, the conviction will be upheld." *United States v. Turner,* 93 F.3d 276, 281 (7th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996). For purposes of 21 U.S.C. § 846 (pursuant to which the defendants in this case were charged), "a conspiracy is a confederation of two or more individuals formed for the purpose of committing, by their joint efforts, a criminal act prohibited by the Controlled Substances Act." *Id.; see also United States v. Larkins,* 83 F.3d 162, 165–66 (7th Cir.1996). To establish the defendant's guilt, the government must demonstrate with substantial evidence both that a conspiracy existed and that the defendant knowingly agreed to participate in that conspiracy. *Hightower,* 96 F.3d at 214, *Turner,* 93 F.3d at 282; *Larkins,* 83 F.3d at 166. The proof may be either direct or circumstantial. *Hightower,* 96 F.3d at 214. Proof of a formal agreement to conspire is, of course, not required. *Turner,* 93 F.3d at 282. "Rather, the jury properly may find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." *Id.* (internal quotation marks and citations omitted).

As Carraway acknowledges, several witnesses with firsthand knowledge of cocaine trafficking at the green house identified Carraway as a supplier of the narcotic; more than one saw him with cocaine in hand. That these witnesses may have been interested in pleasing the government by helping to secure the convictions of Carraway and the other defendants who proceeded to trial, as Carraway suggests, is certainly a matter relevant to their credibility, as is the fact that other witnesses familiar with operations at the green house claimed never to have seen Carraway there. But questions of credibility typically are for the jury, not for us. *See, e.g., United States v. Archambault,* 62 F.3d 995, 999 (7th Cir.1995); *see also United States v. Crowder,* 36 F.3d 691, 696 & n. 1 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1146, 130 L.Ed.2d 1105 (1995). Carraway has identified no circumstance which renders the key testimony against him inherently incredible. *See id.* Looking at the evidence in the light most favorable to the government, which means crediting the witnesses against Carraway, it is clear that the evidence was more than sufficient to establish that Carraway conspired with his co-defendants to distribute cocaine by supplying cocaine for re-sale at the green house.

**2.**

After one day of deliberations, the jury indicated that it had reached unanimous verdicts as to each of the five defendants on trial. The completed verdict forms, which the clerk read aloud in open court, declared that the jury found each of the defendants, including Carraway, guilty. *See* Tr. XII 4. However, in the midst of follow-up polling, the seventh juror to be polled revealed that she did not agree with the jury's finding against Carraway. *Id.* at 16. After a recess during which the court conferred with counsel, the court finished polling the remaining jurors as to the other defendants. That was completed without incident.

The court then denied Carraway's motion for a mistrial and directed the jury to resume deliberations as to Carraway. Tr. XII 27. Less than an hour later, the jury foreperson sent the court a note stating, "It is very

evident we're not going to come to a conclusion on the defendant John L. Carraway as charged in Count 2." *Id.* at 30. The court conferred once again with counsel. Carraway's attorney suggested that the court "bring them out and tell them to go back in and reconsider it and come out with a decision." *Id.* The jury was summoned, and in open court the court inquired whether further deliberations would be fruitful at that time. *Id.* at 31. The foreperson thought not. *Id.* The court elected to send the jurors home for the evening and have them return the following morning. *See* Tr. XIII 2. After two hours of deliberations the next day, the jury returned a guilty verdict against Carraway on the conspiracy charge. Polling confirmed that the verdict was unanimous. *Id.* at 2–3.

Carraway objects initially to the court's determination to complete polling of the jurors after the one juror expressed disagreement with the verdict against Carraway. This is a matter committed to the district court's discretion. *United States v. Gambino,* 951 F.2d 498, 501 (2d Cir.1991) (collecting cases), *cert. denied,* 504 U.S. 918, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992). "[T]he weight of authority suggests that when the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision and not merely because the judge continued to poll the jury." *Id.* Here, Carraway points to no evidence of coercion other than the court's decision to resume polling. In that regard, we note that when Judge Stiehl decided to resume polling of the other five jurors, he wisely had them asked solely about the verdicts against the other four defendants, not Carraway. His decision to proceed in that fashion averted further disclosure as to the numerical division of the jury (*see Brasfield v. United States,* 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926)), and relieved the objecting juror of any additional pressure that she might have experienced had further polling as to Carraway confirmed in open court that she was the lone dissenter. At the same time, continued inquiry as to the other defendants accommodated their abso-

lute right to have the jury polled. *See United States v. Marinari,* 32 F.3d 1209, 1212 (7th Cir.1994). We discern no error in the decision to complete the polling in this manner, let alone any prejudice to Carraway.

Carraway's principal objection, however, is to the court's decision to have the jury resume deliberations as to him rather than declaring a mistrial immediately after the one juror expressed doubt as to the initial verdict against him, as he requested. This decision too is one within the district court's discretion. Fed.R.Crim.P. 31(d); *see United States v. Williams,* 873 F.2d 1102, 1105 (8th Cir.1989); *United States v. Deerman,* 837 F.2d 684, 688–89 (5th Cir.), *cert. denied,* 488 U.S. 856, 109 S.Ct. 146, 102 L.Ed.2d 118 (1988); *Deane v. Dunbar,* 777 F.2d 871, 875 (2d Cir.1985); *United States v. Love,* 597 F.2d 81, 85 (6th Cir.1979). Our opinion in *United States v. Byrski,* 854 F.2d 955, 961 (7th Cir.1988), which the government cites to us, identifies a number of factors that bear on the propriety of the district court's decision to declare a mistrial when a jury declares itself deadlocked. This case presents the flip side of that decision, for the court decided not to simply declare a mistrial as Carraway requested but to order the jury to continue deliberations. The considerations here are therefore different, for we need not consider, as we did in *Byrski,* whether there was a "manifest necessity" to declare the trial at an end and leave the door open to a second trial. *Id.* at 960; *see Wade v. Hunter,* 336 U.S. 684, 690, 69 S.Ct. 834, 838, 93 L.Ed. 974 (1949); Nonetheless, we agree that the factors we identified as relevant to that determination are useful in evaluating the exercise of the court's discretion here. These include (1) the jury's own collective belief that it cannot reach a unanimous verdict; (2) the length of time that the jury has already deliberated; (3) the length of the trial; (4) the complexity of the issues that the jury must decide; (5) communications between the judge and jury; and (6) the impact that the jurors' exhaustion and the coercive threat of further deliberations might have upon the verdict. *Id.* at 961 (quoting *Arnold v. McCarthy,* 566 F.2d 1377, 1387 (9th Cir.1978)); *see also Escobar v.*

*O'Leary,* 943 F.2d 711, 718 (7th Cir.1991). We also think it appropriate in this context to consider a factor that the court in *Byrski* put aside—whether or not the defendant objected to the court's chosen course of action. *See* 854 F.2d at 961 & n. 10. These considerations reveal no abuse of discretion in the district court's decision to order the jury to continue its deliberations. It is worth noting at the outset that when the court decided for the first time to have the jury continue deliberating—after polling of the jury had been interrupted by the juror's announcement that she disagreed with the guilty verdict against Carraway—there was no clear indication that the jury was deadlocked as to Carraway's culpability and that further deliberations would be fruitless. The jury had, after all, signed a unanimous verdict as to Carraway, and the reasons for the objecting juror's second thoughts were (and are) unknown. Only after the jurors had been sent back to the jury room to reconsider the verdict against Carraway was the court apprised, by way of a note from the jury's foreperson, that the jury believed itself deadlocked. At that juncture, Carraway did not renew his motion for a mistrial, but instead urged the court to have the jury continue deliberating. The judge decided to called the jury into court and, when he inquired of the foreperson whether further deliberations would be helpful *"now,"* the foreperson responded in the negative. Tr. XII 31. In this context, it is not at all clear that the foreperson believed that *any* further negotiations would be futile. In any case, at that point, the jury had only deliberated one full day as to all five defendants and eighteen counts of the indictment, and at most for an hour or so as to the conspiracy charge against Carraway following the interruption in polling. The trial, by contrast, had gone on for eleven days, during which time over 200 exhibits had been introduced and more than eighty witnesses had testified. It was perfectly reasonable for the judge to conclude in these circumstances that bringing the jury back after a night's rest was appropriate. The possibility of coercion under these circumstances strikes us as de minimis. The judge himself put no pressure on the jury, and given that the jury had met for less than an hour to reconsider the verdict against Carraway before announcing a deadlock, we see nothing inherently coercive in asking the jury to return for a second day of deliberation after a night off.

## B. John H. Bond (No. 94–2023)

### 1.

██ Bond challenges the sufficiency of the evidence underlying his convictions for conspiracy and possession of cocaine with the intent to distribute. Bond's challenge invites us to make credibility determinations that are beyond our authority and ability as appellate judges to render, however. *See United States v. Archambault, supra,* 62 F.3d at 999. For example, Bond acknowledges that co-conspirators Lamont Oakley (Tr. II 119, 130), Trinidad Rodriquez, Jr. (Tr. II 192–93), Warrick Scott (Tr. III 93–94), and Jesus Rodriquez (Tr. III 203) all testified as to Bond's direct involvement in the conspiracy. These witnesses identified Bond as a frequent supplier of cocaine to Robert Rodriquez's operation at the trailer. *See also* Tr. III 38–43 (Shirley Johnson); IV 152–54 (Ethel Cade). Yet, Bond would apparently have us conclude that this testimony was incredible simply because other witnesses said that Bond never provided cocaine to them or that they had never had any dealings with Bond. *See* Tr. II 54 (Jackie Wilson); II 219 (Richard Wilson); III 9 (Keith Holman); III 142 (Brian Holley); III 181 (Terrence Carter). The government explains away the inconsistency by noting that most of these individuals distributed cocaine from locations other than the trailer, and thus would not have had occasion to obtain their supplies from Bond. (Gov.Br.28.) But even assuming that some question was raised as to the veracity of the witnesses who inculpated Bond, he has made no effort to explain why this was not the routine sort of credibility question that lies within the province of the jury to sort out. Bond's attack on his possession convictions is equally flawed. Bond was charged with possessing cocaine with the intent to distribute on four separate occasions. Bond concedes that the government presented witnesses who testified that Bond distributed cocaine on three of these occasions and that a distribution-sized quantity of cocaine was found in

his home on the fourth (Bond Br. 2–3; see Tr. V 48–50, 55–62, 149–56, VI 97); he merely points to his own testimony denying that he possessed or distributed cocaine (Tr. IX 51–56) and in one instance, the testimony of an eyewitness who did not see any drugs change hands (Tr. IX 37–38), as evidence that he should have been acquitted. The jury clearly did not believe Bond, however, and again we are given not so much as a hint as to why the government's witnesses, whom the jury evidently believed, were necessarily incredible. *See United States v. Crowder, supra,* 36 F.3d at 696 & n. 1.

### 2.

Bond presents a more substantive challenge to his convictions for using a firearm in connection with a narcotics transaction. Bond was charged with "using or carrying" a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c), on two occasions. In *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), decided after Bond was convicted and sentenced, the Supreme Court defined the "use" of a firearm in a more narrow fashion than we had previously. *Bailey* requires that a gun be "actively employed" before it may deemed to have been "used" for purposes of section 924(c)(1). *Id.* at ——, 116 S.Ct. at 509. Consequently, although "brandishing, displaying, bartering, striking with, and most obviously firing or attempting to fire" the gun would qualify as a "use" (*id.* at ——, 116 S.Ct. at 508) mere possession or storage of the weapon nearby would not (*id.* at —— ——, 116 S.Ct. at 508–09). In this case, however, the jury was instructed in accord with our pre-*Bailey* precedents that:

> The government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of

violence or drug trafficking crime was committed.

Insofar as this concerned what the government must prove to establish a "use" of the firearm for purposes of section 924(c), the instruction misstated the law. Bond did not object to this instruction below; nonetheless, we must consider whether the error, which at this juncture is plain in light of *Bailey* (*see United States v. Holmes,* 93 F.3d 289, 292 (7th Cir.1996)) prejudiced Bond's substantial rights—that is, whether it " 'affected the outcome of the district court proceedings' " (*id.,* quoting *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993)).[1] Our opinion in *United States v. Robinson,* 96 F.3d 246 (7th Cir.1996), outlines the framework that we employ in deciding what to do with the defendant's conviction under section 924(c)(1) when the jury was given a flawed pre-*Bailey* instruction on "using or carrying" a firearm:

> 1) if all the firearms evidence presented qualifies as either active-employment "use" or "carry," we will affirm the conviction despite the bad instruction, *see, e.g., United States v. Baker,* 78 F.3d 1241, 1245–47 (7th Cir.1996); 2) if none of the evidence presented qualifies as either active-employment "use" or "carry," we will reverse the conviction outright, *see, e.g., United States v. Monroe,* 73 F.3d 129, 132–33 (7th Cir.1995); and 3) if some of the evidence presented could qualify as either active-employment "use" or as "carry," but other firearms evidence presented exemplifies only possession or some other type of now-defunct, inactive "use," we will reverse the conviction and remand for a new trial, since we cannot be sure whether the jury convicted on the proper basis or the improper basis, *see, e.g., United States v. Thomas,* 86 F.3d 647, 650–51 (7th Cir. 1996).

96 F.3d at 250. *See also United States v. Cotton,* 101 F.3d 52, 56 (7th Cir.1996).

---

1. Bond's challenge to his section 924(c)(1) convictions is framed, of course, as a challenge to the sufficiency of the evidence, rather than a challenge to the jury instruction that *Bailey* subsequently rendered erroneous. But, as we have previously explained, "our analysis of such sufficiency challenges under *Bailey* 'must also be informed ... by the rules that govern our assessment of erroneous jury instructions.' " *United States v. Robinson,* 96 F.3d 246, 250 (7th Cir. 1996) (quoting *United States v. Gonzalez,* 93 F.3d 311, 320 (7th Cir.1996)).

■ We find the evidence sufficient to sustain Bond's conviction on Count 44 of the indictment. That count alleged that Bond used and carried a .44 caliber revolver in relation to his possession with the intent to distribute 24.3 grams of crack cocaine on October 1, 1992. In support of the charge, the government's informant, Keith Lauderdale, testified that he met Bond in the stall of a Washington Park carwash. Apparently, Bond simply handed the cocaine to Lauderdale from the cab of his truck after Lauderdale gave him the purchase money. During the transaction, Lauderdale observed what appeared to be a pistol resting on or near the cellular phone in Bond's truck. Tr. V 60. Although there is no testimony suggesting that Bond made any affirmative "use" of the gun during the exchange, it is evident that he "carried" the weapon. The gun was present in the truck Bond had driven to the transaction, and was easily within Bond's reach, available for immediate use during that transaction. We have found comparable facts to constitute carrying within the meaning of section 924(c)(1). *United States v. Baker,* 78 F.3d 1241, 1247 (7th Cir.1996); *see also United States v. Molina,* 102 F.3d 928, 932 (7th Cir.1996); *Cotton,* 101 F.3d at 55–57. And because Lauderdale's account was the sole testimony presented in support of the charge, the evidence supports a "carrying" finding alone; this is not, in other words, a case in which the jury might instead have relied on other evidence pointing to the type of inactive "use" of the weapon that would fail *Bailey*'s analysis. *Cf. United States v. Thomas,* 86 F.3d 647, 651 (7th Cir.), *cert. denied sub nom. Story v. United States,* —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996). Properly instructed, therefore, the jury would have convicted Bond for "carrying" the revolver to the October 1, 1992 transaction with Lauderdale.

■ In contrast, we find the evidence insufficient to sustain Bond's conviction on Count 55 of the indictment. That charge grew out of a search of Bond's residence on February 23, 1993. A distribution-sized quantity (38.89 grams) of cocaine was discovered there, along with several firearms. The government's theory was thus that Bond had possessed the firearms in close proximity with the cocaine. *E.g.,* Tr. XI 25. There was no evidence, however, that Bond had actively used or carried any of the firearms in connection with his possession of the cocaine discovered in his residence. The evidence supported only a finding of the type of passive use that *Bailey* rejected as a foundation for a section 924(c)(1) conviction. *E.g., United States v. James,* 79 F.3d 553 (7th Cir.1996). The government conceded as much at oral argument. We are therefore compelled to reverse Bond's conviction on this count. We must also vacate Bond's sentence and remand his case to the district court for re-sentencing, because his conviction on this count added twenty years to his term of imprisonment. *See* 18 U.S.C. § 924(c)(1).

### 3.

■ Bond suggests that his convictions on two felon-in-possession-of-a-firearm charges (*see* 18 U.S.C. § 922(g)(1)) are defective because the government did not establish that he was in fact a convicted felon at the time he possessed the firearms in question and he was precluded from offering evidence that, in his view, demonstrates that he was not a felon. As to the first point, we note the government offered into evidence a certified copy of an information, plea, and sentence indicating that Bond had pleaded guilty in a Missouri court to the felony offense of possessing marijuana. Bond argues that this was insufficient to establish his status as a felon absent the testimony of a prosecutor, judge, or public defender with knowledge of that conviction or some other type of corroborating evidence. But that argument is foreclosed by ample precedent finding certified copies of convictions to be sufficient for purposes of section 922(g)(1) and similar statutes. *See, e.g., United States v. Hudspeth,* 42 F.3d 1015, 1019 n. 6 (7th Cir.1994) (en banc) (discussing 18 U.S.C. § 924(e)(1)), *cert. denied,* —— U.S. ——, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).[2] As to

**2.** Bond also points to some apparent discrepancies in the dates of the file stamps on the certified

the second point, we note that Bond sought to show that despite his Missouri conviction, he had been able to obtain employment with the U.S. Postal Service, had purchased firearms from a pawn shop, and had obtained a firearm owner's identification card because the individuals who had performed record checks had decided that he was not a felon. Tr. IX 3. But what these individuals thought was, as the district court correctly found, irrelevant. What matters is whether Missouri deemed Bond's conviction one for a felony rather than a misdemeanor. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir.1994); *United States v. Bustamante*, 706 F.2d 13, 14 (1st Cir.) (Breyer, J.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). The certified documentation offered into evidence by the government indicated that it did, and Bond offered no evidence to the contrary.

4.

■ Bond also suggests that he was prejudiced when the government was permitted to introduce into evidence the guilty pleas of five co-defendants who did not testify at trial. The government offered the pleas, and the district court allowed them into evidence, so as to place the charged conspiracy "into context," that is, to explain to the jury what became of the named co-defendants who were not on trial and who had not testified. Tr. VII 132–33; VIII 2. The court did not allow into evidence the stipulations of fact underlying each of the pleas.

■ We believe that the court erred in admitting the plea agreements into evidence. When a co-defendant pleads guilty and then testifies against another defendant, it is common for the co-defendant's plea agreement to be disclosed and possibly offered into evidence. From the defense perspective, the fact that the testifying co-defendant has pleaded guilty bears on the co-defendant's credibility, because it raises the possibility that he or she is testifying against the defendant in the hope of currying favor with the government and lessening his punishment.

With that basis for impeachment in mind, the government often elects to place the plea into evidence at the outset of the co-defendant's testimony and thus to take the wind out of the defense's sails by establishing that the co-defendant has merely agreed to tell the truth and has not been promised anything in return other than what is specified in the agreement. Disclosure of the plea also serves the more rudimentary purpose of explaining why the defendant's fellow accused would be willing to take the stand and confess his or her own participation in criminal activity. *See, e.g., United States v. McNeal*, 77 F.3d 938, 945 (7th Cir.1996); *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir.), *cert. denied*, 513 U.S. 940, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994); *United States v. Alex Janows & Co.*, 2 F.3d 716, 719–20 (7th Cir. 1993). When the co-defendant does not testify, however, the fact of his plea, and the content of his plea agreement, typically will have little or no probative value—his or her credibility is not at issue. It is no doubt true, as the government points out, that the jury will wonder what happened to the co-defendants whose names have been mentioned in the indictment and in the course of the trial but who have not appeared before them. But the jury can be instructed simply not to concern itself with that question, and we have identified that as the preferred course. *United States v. Barrientos*, 758 F.2d 1152, 1156 (7th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986); *see also* Edward J. Devitt, Charles B. Blackmar, *et al.*, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 5.02, at 106 (1992). Disclosing the pleas, when the jury has never had an opportunity to hear from the persons who pled guilty, presents the risk that the jury will impermissibly infer the guilt of the defendants on trial. *Johnson*, 26 F.3d at 677; *see also Barrientos*, 758 F.2d at 1158. Thus, where a missing co-defendant does not testify, "[i]t is generally accepted that absent agreement, 'courts and prosecutors generally are forbidden from mentioning that a co-defendant has either pled guilty or been convicted.'" *Johnson*, 26 F.3d at 677 (quoting

documents offered into evidence, but we do not think they call the validity of his conviction into

question.

*United States v. Griffin,* 778 F.2d 707, 710 (11th Cir.1985)). We can envision circumstances in which the fact of a non-testifying codefendant's plea, or the contents of his plea, might become relevant. For example, *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), on which the government relies, sustained the admission of a non-testifying co-defendant's confession. There the defendant had himself confessed but claimed at trial that the authorities had simply shown him his co-defendant's confession and coerced him into copying it. The co-defendant's confession was then offered in rebuttal to show that there were significant differences between the two confessions and thus to demonstrate that the defendant had not, in fact, copied his co-defendant's confession. This is a much different case, however. None of the defendants had elicited any testimony or made any claim that would render the plea agreements of the absent codefendants relevant. Given the inherent risk of prejudice that evidence of the pleas presented, FED. R. EVID. 403 compelled their exclusion. *See Griffin,* 778 F.2d at 710.

■ Nonetheless, having reviewed the record, we believe the error harmless. When the pleas were admitted into evidence, the district court instructed the jury not to consider them as evidence against the defendants on trial. Tr. VIII 3; *see United States v. Phillips,* 640 F.2d 87, 91–92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); FEDERAL JURY PRACTICE AND INSTRUCTIONS § 5.02, at 106 (prejudicial effect of disclosing guilty plea of codefendant may be corrected by cautionary instructions). There was no fanfare when the pleas were admitted, and the government made no improper arguments based on those pleas. Finally, we are convinced that the evidence introduced against each of the defendants at trial, including Bond, was overwhelming. We are therefore confident that the jury's verdict was untainted by the error. *See Johnson,* 26 F.3d at 679–80.

## C. James E. Robinson (No. 94–2326)

### 1.

■ James Robinson was convicted on the conspiracy charge as well as on a charge

that he possessed cocaine with the intent to distribute. The government's evidence portrayed Robinson as a seller of cocaine. The possession charge was based on a transaction in which DEA Special Agent David Roth purchased approximately one-tenth of a gram of crack cocaine through Robinson: Roth provided the money to Robinson, who then obtained the cocaine for him at the green house. Robinson concedes that the evidence is sufficient to sustain his conviction on this charge. As to the conspiracy charge, however, Robinson contends that he did nothing more than purchase cocaine in small quantities for personal use. He points to a number of witnesses who testified that Robinson obtained cocaine regularly from the green house but did not identify him as an employee of or distributor for Undray Bradley or Robert Rodriquez and did not know what he did with the cocaine he purchased. *E.g.,* Tr. E 5, 9–10, 21 (Bradley); III 173–74, 182 (Terrence Carter); III 115–16 (John Bennett). Additional witnesses indicated that Robinson also purchased cocaine at the trailer, but said he did not re-sell the cocaine on the premises. Tr. II 111–12 (Lamont Oakley); IV 30–31, 32 (Earnest Rodriquez). At most, Robinson contends, the evidence shows that he had a buyer-seller relationship with other members of the conspiracy; there was no evidence suggesting that he joined the conspiratorial agreement or that any re-sales of cocaine that he made of cocaine purchased from the conspirators were within the contemplated scope of the conspiracy.

As Robinson himself acknowledges, however, there were witnesses who identified him as a distributor of cocaine. Both Earnest Rodriquez (despite his unwillingness to label Robinson a "seller," *see* Tr. IV 32) and his wife, Mary Rodriquez, testified that they saw Robinson purchase cocaine at the trailer and then hand it over to customers, who were often waiting in cars nearby. Tr. IV 9, 60 (Earnest), 77, 90–91 (Mary); *see also* Tr. III 136–37 (Brian Holley). Thus, when asked how it was that he knew what Robinson did with the cocaine he purchased, Earnest Rodriquez explained:

How did I know? Well, the customers were—They would wait on him. They

would drop him off. They would sit there at the house on the corner and wait on him to bring back the dope that he bought from the trailer. Tr. IV 60. Robinson also expressly acknowledged to Lamont Oakley that he obtained narcotics for re-sale to his own customers. Tr. II 182; *see also id.* at 111–12. He also told Agent Roth that he had been purchasing cocaine from "his man" at the green house for "quite a few years." Tr. V 146–49. George Habermehl was one of Robinson's customers. A user of crack cocaine, Habermehl testified that he frequently gave Robinson money to purchase crack cocaine (usually from the trailer) on his behalf. He estimated that the total may have reached $5,000 over time. Habermehl also witnessed Robinson sell cocaine to other people—about 100 of them, by his count. Tr. IV 124–27, 137–38. This is consistent with the testimony of informant Keith Lauderdale, who like Habermehl saw Robinson buy and re-sell cocaine to a number of people. Lauderdale described Robinson's home as "like a regular rock [i.e. crack] house." By his account, "people would come there twenty-four hours a day and get rocks." Tr. V 64–65, 8182. Keith Holman testified that he sold cocaine to Robinson in quantities that could be re-sold. Tr. III 6–8. Coconspirator Patrick Gilmore testified that he "fronted" drugs to Robinson. Tr. III 74. The amounts that Gilmore fronted to Robinson were small (consistent with personal use), and Gilmore claimed that he did not really expect repayment (*id.*), but Gilmore's generosity suggests that Robinson enjoyed something more than a casual relationship with the conspiracy.

Viewed favorably to the prosecution, we believe this evidence more than sufficient to establish Robinson's culpability as a co-conspirator. The testimony of multiple witnesses established that Robinson repeatedly acquired cocaine from the trailer and the green house for re-sale to his own customers. His own statement to Roth indicated that he had been dealing with his source at the green house for an extended period of time. Thus, Robinson had a prolonged relationship with the conspiracy through which he obtained drugs for redistribution to others. The reason for his purchases was known to other members of the conspiracy—they saw Robinson redistribute the cocaine to his waiting customers. Robinson did, apparently, obtain cocaine from multiple sources. But his willingness to steer his business to the green house and trailer-where he could run inside, purchase cocaine, and re-sell it to the customer waiting in a car outside—and his ability to occasionally have cocaine fronted to him, reveal a mutually profitable relationship with the other members of the conspiracy. A jury could reasonably infer from this arrangement that the relationship between Robinson and the conspiracy was more than that of buyer and seller, that Robinson was fully aware of the conspiracy's aim, and that he furthered its ends by distributing cocaine supplied to him by other conspirators.

### 2.

Robinson also argues that the district court erred when, in passing sentence, it deemed him responsible for between 1.5 and 5.0 kilograms of crack cocaine. This is a factual determination that we review for clear error (*e.g., United States v. Tanksley,* 104 F.3d 924, 925–26 (7th Cir.1997) (per curiam); *United States v. Robinson,* 96 F.3d 246, 252 (7th Cir.1996)), and we find no such error here. The district court's estimate of the amount of cocaine trafficked by the conspiracy and foreseeable to Robinson was conservative. Robinson sold cocaine to large numbers of people. Habermehl estimated that he witnessed sales to 100 different individuals, and Lauderdale pegged Robinson's residence as "a regular rock house" where crack cocaine was available for purchase at virtually any hour of the day or night. On the supply side of the equation, Undray Bradley alone sold cocaine to Robinson an average of three times per day (apparently he was Robinson's "man" at the green house). Tr. E 10. Given the frequency with which Robinson bought and sold cocaine, the total amount he moved was no doubt substantial. Based on the frequency of transactions and the amounts typically involved, the district court is permitted to estimate the total amount of cocaine attributable to the defendant. *United States v. Golden,* 102 F.3d 936, 944 (7th Cir.1996). Robinson ap-

parently did have multiple suppliers, so not all of the cocaine that he sold to customers may have been attributable to the conspiracy. But as a frequent purchaser of cocaine for resale from more than one of his co-conspirators, Robinson without doubt would have foreseen that the conspiracy involved amounts of cocaine in excess of a mere 1.5 kilograms. " 'In a drug conspiracy, each conspirator is responsible not only for amounts with which he was directly involved, but also for amounts involved in transactions by co-conspirators that were reasonably foreseeable to him.' " *United States v. Garrett,* 45 F.3d 1135, 1141 (7th Cir.) (quoting *United States v. Paters,* 16 F.3d 188, 191 (7th Cir. 1994)), *cert. denied,* —— U.S. ——, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). Robinson's relationship with "his man" at the green house was longstanding by his own account, and his frequent role as a kind of narcotics car hop for customers at the green house and trailer gave him first-hand notice of the conspiracy's capacity, even if, as he argues, he played no managerial role in the conspiracy. *See id.* at 1141. Bradley testified that in his year at the green house, he sold two ounces, or roughly 56 grams, daily. Tr. E 42–43. Those sales alone would have amounted to total of twenty kilograms over a year's time. Under these circumstances, the district court's decision to hold Robinson accountable for only 1.5 kilograms was highly conservative.

### D. James Rodriquez (No. 94–2327)

Like James Robinson, James Rodriquez was convicted on the conspiracy charge and on an additional charge that he possessed crack cocaine with the intent to distribute. And as with Robinson, the government's theory was that Rodriquez sold cocaine at the retail level. Rodriquez contends that the evidence is insufficient to support both of his convictions.

### 1.

■ With respect to the conspiracy charge, Rodriquez argues that at most, the evidence shows that he sporadically obtained drugs from the co-conspirators and then resold them to consumers, but not that he ever intended to join the conspiracy. Like Robinson, Rodriquez argues that his relationship with the conspirators was no more than that of buyer and seller. In that vein, Rodriquez emphasizes that he alone among the charged co-conspirators did not live in Washington Park, that he was legitimately and gainfully employed and showed no signs of unexplained wealth, that when he was present in Washington Park it was for the purpose of visiting and performing handiwork for his relatives (several of whom were members of the conspiracy) and nothing more, and that many of the co-conspirators either expressly testified that he had no role in the conspiracy or so implied by omitting mention of his name.

A view of the evidence favorable to the government sustains the jury's conclusion that Rodriquez was a member of the conspiracy, however. Numerous witnesses testified that Rodriquez routinely bought cocaine from other members of the conspiracy (principally from co-conspirator Jackie Wilson) for resale to his own customers. *See* Tr. II 55–56 (Jackie Wilson); II 123 (Oakley); II 189 (Trinidad Rodriquez II); II 206–07 (Trinidad Rodriquez III); III 94–95 (Warrick Scott); IV 9–10 (Earnest Rodriquez); *see also* Tr. II 3 (Undray Bradley); III 75 (Patrick Gilmore); III 133–35 (Brian Holley). As in Robinson's case, both George Habermehl and Keith Lauderdale testified to purchases from Rodriquez. Tr. E 123; *see also* E 139–40 (Habermehl); E 64 (Lauderdale).[3] Indeed, much like Robinson, Rodriquez apparently made it his practice to flag down cars and procure cocaine for the occupants (as the circumstances underlying his possession conviction, discussed immediately below, reveal). The jury could reasonably infer that Rodriquez did not merely buy drugs from the conspirators on isolated occasions, but worked to both his own profit and that of the conspiracy by making regular and frequent purchases of cocaine for re-sale to individual buyers.

---

**3.** Rodriquez attacks their credibility in view of the fact that both were admitted crack cocaine addicts; but this was a matter for the jury to consider in evaluating their testimony. *See, e.g., United States v. Curry,* 79 F.3d 1489, 1496 (7th Cir.1996).

### 2.

■ Rodriquez also contends that the evidence is insufficient to support his conviction for possession of cocaine with the intent to distribute. The possession charge was based on a purchase of cocaine from Rodriquez by undercover narcotics agent Johnny Singleton and an informant on August 10, 1992. Apparently, their intent was to purchase the cocaine from Robert Rodriquez. Not finding him in at the trailer, Singleton and his informant drove to the home of Rose Rodriquez (Robert's mother). There a young man who had been standing by a fence approached the car and asked Singleton what he wanted. Singleton answered "two sixteenths" and gave him $200. The young man went into the house, and after Singleton drove around the block, the man handed the informant three or four "rocks," which upon subsequent testing were confirmed to be two grams of crack cocaine. Tr. V 13–19, 22–26. Singleton did not know who the man was, although he had seen him at the trailer previously. Seventeen days after this transaction he identified James Rodriquez from photographs as the individual who had sold him the cocaine. Tr. V 30–31. Rodriquez suggests that the delay in identifying him raises an eyebrow. He argues that further doubts are raised by certain inconsistencies between a contemporaneous written report of the transaction and his trial testimony. For example, at trial Singleton said that he gave Rodriquez the money for the cocaine at the outset of the transaction, but the written report of a fellow officer, whom Singleton had briefed immediately after the purchase, suggested that Singleton gave Rodriquez the money only after Rodriquez had obtained the cocaine. See Tr. V 27–28. Finally, he suggests that the evidence as to the handling and testing of the cocaine he sold to Singleton was insufficient to establish a proper chain of custody.

None of the circumstances that Rodriquez has cited calls into question the sufficiency of the government's case. Certainly they were matters for the jury to weigh in assessing the veracity of the government's evidence; these types of discrepancies were in fact pointed out to the jury as reasons to doubt the possession charge. See Tr. XI 55–56. But none so gravely undercuts the reliability of the government's case that the jury was bound to disbelieve it.

### 3.

■ At sentencing, the district court found that distribution of between 1.5 and 5.0 kilograms of crack cocaine in furtherance of the conspiracy was reasonably foreseeable to Rodriquez, and the court thus held him responsible for that amount in calculating the sentencing range. Emphasizing that he operated independently as a street-level dealer and that he was detained on state charges for significant periods of time over the life of the conspiracy, Rodriquez argues that the record is devoid of support even for the notion that he was continuously affiliated with the conspiracy, let alone that he could foresee the amounts of cocaine distributed by the members of that conspiracy.

We find no clear error in the district court's attribution of at least 1.5 kilograms of crack cocaine to Rodriquez. The evidence reveals that Rodriquez made sales of cocaine that he obtained from other members of the conspiracy throughout the conspiracy's duration. It is true that Rodriquez was involuntarily absent at certain times during the conspiracy; on the other hand, he appears to have been quick to resume his participation when he was free to do so, a circumstance that puts to rest any inference that he permanently withdrew from the conspiracy. Even if we set aside sales made by the conspiracy during times that Rodriquez was in custody, given the large volume of sales involved in the overall conspiracy and the frequency of Rodriquez's own sales, holding him accountable for 1.5 kilograms is eminently reasonable.[4]

---

**4.** We noted earlier that by Bradley's estimate, the green house was distributing two ounces of crack cocaine per day, which would mean sales in excess of twenty kilograms during his year-long tenure at that location. *Supra* at 758. With respect to the trailer, Lamont Oakley, who described business at the trailer as "big" (Tr. II 110) estimated that approximately eleven ounces of cocaine were sold per week from that location (Tr. II at 138–39). That estimate may be conser-

#### 4.

 Finally, Rodriquez contends that the district court committed clear error when it denied him an offense-level reduction of either two or four levels for playing a minor or minimal role in the offense. U.S.S.G. § 3B1.2.; *see United States v. Jackson*, 95 F.3d 500, 510 (7th Cir.1996), (findings as to defendant's role in the offense are reviewed for clear error), *cert. denied*, —— U.S. ——, 117 S.Ct. 532, 136 L.Ed.2d 417 (1996), and *cert. denied sub nom. Stephans v. United States*, —— U.S. ——, 117 S.Ct. 404, 136 L.Ed.2d 318 (1996), and *cert. denied*, —— U.S. ——, 117 S.Ct. 717, 136 L.Ed.2d 636 (1997). We disagree. Such adjustments are to be used infrequently. *Tanksley, supra*, 104 F.3d at 925–26. The district court recognized that as a street-level dealer, Rodriquez may not have been as culpable as other members of the conspiracy. Sentencing Tr. 30. But sales at the street level are obviously vital to the success of a narcotics conspiracy. As a dealer who made recurrent purchases from the conspiracy for re-sale to users of cocaine, Rodriquez thus made a significant contribution to the illicit ends of the conspiracy, his periodic absences due to incarceration notwithstanding. *See Tanksley*, 104 F.3d at 925–26.

### E. Elizabeth Wiggins (No. 94–2329)

Elizabeth Wiggins lived with and ultimately married Robert Rodriquez. She was convicted on the conspiracy charge alone.

#### 1.

 Contending that the evidence against her was "inconsistent and saturated with contradictions" (Wiggins Br. 10), Wiggins argues that her conviction on the conspiracy charge cannot be sustained. She notes that the prosecution witnesses who implicated her at trial had never mentioned her in their pre-trial proffers to the government, that several witnesses were unaware of her involvement in the conspiracy, that none of the government's agents, informants, or video surveillance had ever identified her as a

participant in the conspiracy, and that several people actually recall her counseling against the sale of drugs and expressing a desire not to be involved in any wrongdoing.

But the testimony of the government's witnesses presents a significantly different picture, and this one lends ample support to Wiggins' conviction. Crediting these witnesses, as our deferential review compels us to do, it appears that Wiggins not only handled cocaine herself (Tr. E 14–15 (Undray Bradley); II 208–09 (Trinidad Rodriquez III); *see also* Tr. III 116 (John Bennett)) and was present when it was "cooked" to produce crack (Tr. II 123 (Lamont Oakley)), but also transported the cocaine in her purse (Tr. III 116 (Bennett); *see also* Tr. IV 75 (Mary Rodriquez)), hid it when necessary (Tr. III 138 (Brian Holley)), and counted the cash realized on sales of the narcotic (Tr. III 125–26 (Bennett); *see also* IV 72 (Mary Rodriquez)). At times she even acted in a managerial capacity. Tr. III 138–40 (Holley); Tr. IV 10–12 (Earnest Rodriquez). It was she, for example, who ordered that the trailer operation be shut down when Robert Rodriquez was hospitalized for injuries he received in a December 1992 motorcycle accident. Tr. II 114–15, 118 (Lamont Oakley). Such testimony is obviously more than sufficient to establish her culpable involvement as a coconspirator. Whether the omission of her name from the proffers of the witnesses who later testified against her was adequately explained was a credibility question for the jury to resolve. Similarly, although it was Wiggins herself who on one occasion reported her husband's cocaine trafficking at the trailer to the police, it was for the jury to decide whether that report reflected her own innocence of any wrongdoing. The jury clearly believed that despite her claims of innocence, Wiggins had taken an active role in the conspiracy, and we have no reason to disturb that judgment.

#### 2.

 Wiggins also contends that she was prejudiced when, in his opening statement to

---

vative, given the high volume of automobile traffic that video surveillance recorded at the trailer. *Supra* at 749. But even using that estimate, the

trailer alone would have distributed approximately sixteen kilograms of crack cocaine in a year's time.

the jury, the prosecutor noted that the indictment had originally named twenty-six defendants, and that a majority of these individuals had "decided they ought to plead guilty." Tr. I 11. A moment later he again noted that the defendants not presently before the jury had pled guilty. *Id.* at 13–14. Wiggins' counsel did not immediately object to the remarks, choosing instead to wait until the close of the government's opening statement (which was quite brief) to ask for a mistrial, a request that the district court denied. Tr. I 15. The government argues that the delay confines our review to one for plain error. That argument finds support in the language of some of our cases, which suggest that an objection must be made during argument. *E.g., United States v. Polland,* 994 F.2d 1262, 1267 (7th Cir.1993), *cert. denied,* 510 U.S. 1136, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994); *United States v. Rodriguez,* 925 F.2d 1049, 1055 n. 11 (7th Cir.1991) (citing *United States v. Jungles,* 903 F.2d 468, 479 (7th Cir.1990)). On the other hand, in view of the motion for mistrial made within moments of the remarks in question, there was not the total absence of an objection below that normally reduces our review to a search for plain error. *Cf. United States v. Levy,* 741 F.2d 915, 923 (7th Cir.1984), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984) (plain error review applied in absence of contemporaneous objection, request for curative instruction, or motion for mistrial). Whatever our standard of review, we see no basis for reversal in the remarks. It may have been improper for the prosecutor to have highlighted the guilty pleas in the way that he did. Especially in view of the fact that a number of the defendants who pleaded guilty would not testify, there was a danger that the jury might be led to draw improper inferences about the guilt of the defendants who had exercised their right to a trial. *See* section II(B)(4), *supra.* However, the district court instructed the jury on several occasions during the trial not to consider the guilty pleas of other defendants as evidence against the defendants on trial. *E.g.,* Tr. III 107; VIII 3; final jury instructions. Those instructions adequately resolved any concerns raised by the remarks of the prosecutor in opening statements.

### III.

With the exception of Bond's conviction on Count 55 of the second superseding indictment, which we reverse in light of the Supreme Court's decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), we affirm the convictions of John Carraway, John Bond, James Robinson, James Rodriquez, and Elizabeth Wiggins. We also affirm the sentences of James Robinson and James Rodriquez. Because the reversal of one of Bond's convictions has an undisputed impact on his sentence, we vacate his sentence and remand his case to the district court for re-sentencing.